### S09Y1594. IN THE MATTER OF WADE GUNNAR ANDERSON.
(685 SE2d 711)

PER CURIAM.

This disciplinary matter is before the Court on the Report and Recommendation of the Review Panel approving the recommenda-

tion of the special master, Jefferson C. Callier, that Respondent Wade Gunnar Anderson be given a one-year suspension with conditions for reinstatement for his violations of Rules 1.15 (I) and 1.15 (II) of the Georgia Rules of Professional Conduct, see Bar Rule 4-102 (d). The State Bar filed exceptions to the special master's and Review Panel's report, in which it did not object to the special master's findings of fact and conclusions of law, but objected only to the level of discipline and asked for disbarment, which is the maximum punishment for both violations. Anderson filed an exception to the Review Panel's addition of satisfying the judgment against him as another condition for reinstatement. Both the State Bar and Anderson filed responses in this Court. Under the facts of these underlying cases and Anderson's past disciplinary history, and after consideration of all pleadings filed in this matter, we agree with the State Bar that disbarment is the appropriate sanction.

This matter arises out of State Disciplinary Board Docket numbers 5081, 5084, 5085, 5141 and 5181, plus an additional matter known as the "Moore 2" closing, which was not previously addressed in the filed actions. The parties agreed that all proceedings could be consolidated and the special master and Review Panel each issued one report addressing all of them. The cases arose out of Anderson's handling of his real estate trust account. The following facts were stipulated:

Anderson is a real estate closing attorney approved by First American Title Insurance Company ("FATIC"). In Spring 2005 several of his key employees quit and he assigned to his remaining employee — a college student — the task of sending wire transfers of funds from the closings. That employee mistakenly double wired funds from a single closing, meaning that the recipients were paid twice, and then the employee quit. As Anderson had no employees left to assist him, FATIC recommended Whatley as a "qualified closing assistant" so he hired Whatley. Within a two-week period, however, Whatley double wired funds on *nine* separate closings and when questioned about her actions, Whatley quit. As a consequence of the double wires, Anderson's trust account became overdrawn by approximately $2,300,000 and the recipients did not immediately return the mis-wired funds, so numerous other trust account checks began bouncing. As a result, a temporary restraining order was issued and a receiver was appointed to take over Anderson's law practice.

### The Moore 2 Closing

This matter arose from Anderson's practice of creating a paper trail by writing a check drawn on the trust account for deposit

directly back into the same trust account showing the funds from the closing (FATIC confirmed that this is a recognized practice). Instead of putting the check for the Moore 2 closing in the trust account, however, Whatley added it to the funds for deposit to the operating account and the funds were spent before the mistake was noticed. As Anderson was unable to satisfy obligations due to his trust account being overdrawn, FATIC satisfied some of the debts and now has a judgment against Anderson for $301,128.14.

### SDB Docket No. 5081

Here, Anderson conducted a closing for a client and received more in certified funds from his client than was required to conduct the closing, so he gave the client an escrow account check for the difference of $6,289.60. The check was returned for insufficient funds. The client received a full refund after the receiver was appointed.

### SDB Docket No. 5084

In this case a client entered into a contract to buy a condominium and paid earnest money that went into Anderson's escrow account. The contract fell through and the parties agreed the earnest money should be returned to the client. By then Anderson had transferred all escrowed funds he held to a new law firm, about which he advised the client, who received her refund from the new firm.

### SDB Docket Nos. 5181 and 5085

These matters were based on reports from the Trust Account Notification Program that approximately 63 checks totaling over $76,000 drawn on Anderson's account were presented against insufficient funds. The checks were made good by the receiver.

We agree that in Nos. 5081, 5085 and 5181, Anderson violated Rule 1.15 (I), that he violated Rule 1.15 (II) in the Moore 2 matter, and that no disciplinary rule was violated in No. 5084.

### SDB Docket No. 5141

This matter does not arise from the double wiring of funds. It concerns Bradbary, who owned a penthouse condominium that a buyer Anderson was assisting wanted to purchase. It was alleged that the hot tub in the condo had leaked and caused damage to the building and other units in the building. Bradbary arrived at the

closing expecting to receive the full amount of the funds due without deduction for the potential damage as he had a letter from the condo's law firm stating there was no damage claim. Anderson and the buyer had a letter from the same firm stating that the potential damage claim was $75,052.27. With FATIC's advice and consent, the parties agreed that Anderson would act as an escrow agent and withhold funds from Bradbary's proceeds to satisfy the possible damage claim. Anderson drafted an escrow agreement that the parties executed, and the closing was completed. Anderson felt, however, that Bradbary was being dishonest in attempting to close without setting aside funds for the damage claim and he testified that he personally was subject to risk as any damages paid by FATIC could be the source of an action by FATIC against Anderson. Anderson thus worked to resolve the clouds on the title and reduce the amount of the damage claims, and then paid himself $30,000 from the escrowed funds without Bradbary's knowledge or consent. The damage claim ultimately was determined to be $19,452.39, which FATIC paid (and its judgment against Anderson includes this amount). It is unclear what happened to the rest of the escrowed funds. There still should have been $45,052.27 in the account for Bradbary even after Anderson paid himself but those funds have not been accounted for; Anderson states the funds were there when the receiver took over. Bradbary requests return of $55,599.88 ($75,052.27-$19,452.39). Under the escrow agreement he drafted himself, Anderson was not entitled to any of the escrowed funds as fees and it was his duty to safeguard those funds for Bradbary. By this conduct, Anderson violated Rules 1.15 (I) and 1.15 (II).

We find that the double wiring of funds took place without Anderson's direction or advance knowledge, but although Anderson took steps to remedy the situation, he admits that he failed to adequately supervise his staff and the operation of his practice. The double wiring did not benefit Anderson and he did not receive any proceeds from the double wiring. While we are troubled by Anderson's failure to properly supervise his staff and manage his accounts, we are more troubled by the Bradbary matter as, despite Anderson's explanations, the escrow agreement clearly provides that the agent shall not charge for his services and that in the event of dispute, the disputed funds must be deposited into the court. If Anderson wished to be paid for his services, he should have obtained Bradbary's consent. We find that Anderson acted in bad faith by unilaterally paying himself from the Bradbary funds without consent, see *In the Matter of Kunin*, 252 Ga. 310 (313 SE2d 697) (1984).

Violations of Rules 1.15 (I) and 1.15 (II) may be punished by disbarment. In aggravation of discipline we note Anderson's two prior Formal Letters of Admonition and we apply Bar Rule 4-103,

which allows for disbarment for a third or subsequent disciplinary infraction. Under all the circumstances in this case we find disbarment with conditions prior to petitioning for reinstatement to be an appropriate sanction, see *In the Matter of McFarland*, 275 Ga. 815 (573 SE2d 56) (2002). Accordingly, it hereby is ordered that the name of Wade Gunnar Anderson be removed from the rolls of attorneys authorized to practice law in the State of Georgia. Before he may petition for reinstatement, Anderson must (1) satisfy the judgment in favor of FATIC in the amount of $301,128.14; (2) to the extent not covered by the FATIC judgment, make restitution to Bradbary of $55,599.98 plus interest at the legal rate applicable to liquidated damages from April 11, 2005 through the date of repayment; (3) successfully complete the Law Practice Management Program of the State Bar; and (4) participate in and complete the first Ethics School administered by the State Bar after reinstatement. Anderson is reminded of his duties under Bar Rule 4-219 (c).

*Disbarred with conditions for reinstatement. All the Justices concur.*

DECIDED SEPTEMBER 28, 2009 —
RECONSIDERATION DENIED NOVEMBER 9, 2009.

*William P. Smith III, General Counsel State Bar, Paula J. Frederick, Assistant General Counsel State Bar*, for State Bar of Georgia.

*Wilson, Morton & Downs, James E. Spence, Jr.*, for Anderson.