NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 9, 2022

S22Y0691. IN THE MATTER OF MICHAEL ANTHONY EDDINGS.

PER CURIAM.

This disciplinary matter is before the Court on the Report and Recommendation of the State Disciplinary Review Board, which recommends disbarring respondent Michael Anthony Eddings (State Bar No. 238751) for his violations of Rules 3.3 (false statements to a tribunal), 4.1 (false statements to third persons in connection with representation of a client), 4.2 (a) (communications with persons represented by counsel), 8.1 (a) (false statements in connection with a disciplinary proceeding), and 8.4 (a) (4) (dishonesty in professional conduct) of the Georgia Rules of Professional Conduct found in Bar Rule 4-102 (d). The maximum penalty for a violation of any of these rules is disbarment. Although Eddings vehemently denies violating any of these rules, the special

master, Thomas E. Cauthorn III, who had the opportunity to see and consider the testimony of the witnesses and to review the properly admitted evidence, made credibility determinations adverse to Eddings, and the Review Board adopted those credibility determinations, finding that they were supported by the record. Based on those determinations, which are not clearly erroneous, and the other evidence in the record, we agree with the special master and the Review Board that Eddings's conduct violated the above-mentioned rules and that disbarment is the appropriate sanction for those violations.

In its formal complaint, the Bar asserted that, while representing a client, who had been charged in Muscogee County with murder, Eddings tape-recorded his July 22, 2017 interview with a material witness, who had been charged with making a false statement in connection with the victim's death. Because the witness's interview contained information exculpatory as to Eddings's client and inculpatory as to the witness, Eddings provided a copy of the recording to the Assistant District Attorney in his

2

client's case, who subsequently indicted the witness as a co-defendant in the murder case. Apparently the two co-defendants were tried separately, and both were acquitted. However, during the witness's May 2018 trial on the murder charge, Eddings was called by the State to authenticate his recording of the witness's statement to him, and Eddings testified under oath that he knew at the time he interviewed the witness that the witness was represented by attorney Stacey Jackson; that he was unsuccessful in his attempts to contact Jackson to obtain his consent to interview the witness; and that he conducted the interview anyway because he believed he did not need Jackson's permission.

The very next day, however, on May 18, 2018, Eddings sent an email to the Judge who presided over the witness's murder trial, and to the Chief Judge of the circuit, the Assistant District Attorney in the witness's case, and Jackson. In that email, Eddings attempted to disavow his sworn trial testimony from the day before, asserting that he had "forgotten" that he actually *had* received consent from Jackson to interview the witness; that he obtained that consent in a

June 30, 2017 telephone conversation with Jackson; that there had been witnesses to the consent because he had engaged in the conversation with Jackson via speakerphone while he was in a meeting with his client's family; and that his wife, Cynthia Eddings, who was also his legal assistant, had reminded him of the meeting and Jackson's consent immediately after he completed his testimony under oath at the witness's trial. During the Bar's investigation of this matter, Eddings presented to the State Disciplinary Board ("SDB") sworn affidavits from his wife and from two men, both of whom are related to Eddings's original client. In those affidavits, the witnesses supported the version of events laid out in Eddings's email.

As background, the Bar recounted that, prior to the incident with this witness, Eddings had twice been held in contempt and fined by the Superior Court of Muscogee County for intentionally contacting represented persons without the consent of their lawyers: the first time on July 19, 2013, for contacting his then-client's co-defendant, which resulted in a $500 fine, and the second time on

4

June 9, 2014, for contacting three different represented persons, which resulted in a total fine of $3,000. In connection with the latter contempt action, the court ordered that "Eddings never violate Rule 4.2 again, not in this case or in any future case whatsoever," and that he "never contact or interview a represented client again without permission of that client's attorney." Moreover, as the Bar noted, that latter incident formed the basis for one of Eddings's two prior public reprimands. See *In the Matter of Eddings*, 298 Ga. 434 (782 SE2d 445) (2016) (accepting petition for voluntary discipline and imposing a public reprimand for violation of Bar Rule 4.2) ("*Eddings I*"); *In the Matter of Eddings*, 300 Ga. 419 (795 SE2d 183) (2016) (imposing public reprimand for violations of Rules 1.15 (I) (c) and 1.15 II (b) arising out of the theft of $2.3 million from Eddings's law firm's trust account by his now-former-wife, Sonya Eddings, who was then the firm's financial manager) ("*Eddings II*"). Based on those facts, the Bar charged Eddings with violating Rules 3.3, 4.1, 4.2 (a), 8.l (a), and 8.4 (a) (4) and invoked Bar Rule 4-103 ("A finding of a third or subsequent disciplinary infraction under these Rules

shall, in and of itself, constitute discretionary grounds for suspension or disbarment.").

In his response to the formal complaint, Eddings admitted that he knew Jackson represented the witness "concerning anything surrounding the murder case at hand" but noted that at that time, the witness had not been charged with any crime in connection with the murder itself. Eddings asserted that he had repeatedly tried to contact Jackson in an effort to speak with the witness and that prior to June 30, 2017, when he was able to speak with Jackson about the witness, Jackson deflected his inquiries but never denied him permission to speak to the witness. Eddings contended that, during the June 30, 2017 phone conversation with Jackson, which Eddings put on speakerphone in a room with Eddings's wife and his client's father and uncle present, Jackson gave his consent for Eddings to speak to the witness and stated that the witness had not paid Jackson's fee and that he therefore no longer represented the witness. Eddings said that Jackson's statements in the telephone conversation eliminated, in Eddings's mind, any further

6

responsibility to communicate with Jackson concerning the witness and the murder case.

After discovery, the special master held a lengthy evidentiary hearing, at which testimony was taken from Eddings, Jackson, and the three witnesses who had submitted affidavits in support of Eddings. Jackson testified at the hearing that he did not give Eddings consent to speak with his client. The three witnesses testified consistently with their affidavits, and the father and uncle of Eddings's client, who testified to their exemplary military service and work histories, explained that their family owed no money to Eddings; that they agreed to travel to Atlanta to testify because Jackson had lied about his conversation with Eddings; and that their affidavits were true. The special master issued his report and recommendation in which he concluded, based on his consideration of the testimony, exhibits, oral argument, and briefs, that Eddings *knew* when he interviewed the witness, without Jackson, that the witness had been charged with making a false statement in connection with the murder. The special master recited that, during

7

the witness's trial, Eddings testified under oath that he knew Jackson represented the witness; that he had tried to get Jackson's consent for the interview, but was not able to obtain it; and that he conducted the interview nonetheless. He recited Eddings's adamant sworn trial testimony to the effect he had not sought or received permission from Jackson to interview the witness because he did not believe that he needed such permission. And, although the special master considered the evidence Eddings introduced to support his current version of events, the special master found that version implausible. In explaining why he believed Eddings's testimony at the witness's trial over the email's version of events, the special master did not articulate any basis for doubting the credibility of Eddings's witnesses, but instead pointed to four factors: (1) Jackson unequivocally and consistently testified during the disciplinary hearing that he did not give Eddings permission to interview the witness; (2) Eddings's prior violations of Rule 4.2, "which include[d] two contempt findings, two fines totaling $3,500, and a direct order from a Superior Court Judge to never again violate Rule 4.2 (a)", ,;

8

(3) Eddings did not request, send, or receive any kind of confirmation from Jackson as to his alleged consent; and (4) during his sworn testimony at the witness's trial, Eddings displayed no signs of doubt, equivocation, ambiguity, or questionable memory surrounding his interview of the witness. Thus, the special master concluded that Eddings's testimony during the disciplinary proceedings and the "affidavits and testimony from his wife and the two family members of his client [were] demonstrably false."

Based on his factual findings, the special master concluded that Eddings violated Rule 3.3 (a) (1) by sending the May 18, 2018 email to the judges; Rule 4.1 by sending the May 18, 2018 email to the judges, the prosecutor, and Jackson; Rule 4.2 (a) by communicating with the witness without Jackson's consent even though Eddings knew that the witness was represented by Jackson regarding the murder; Rule 8.l (a) by falsely asserting that he had received permission to interview the witness and submitting false affidavits and testimony to support that claim during these disciplinary proceedings; and Rule 8.4 (a) (4) by repeatedly making

9

false disavowals of his sworn trial testimony and enlisting witnesses to repeat his false statements under oath. The special master further found that Rule 4-103 applied in this case because this would be Eddings's third disciplinary infraction.

The special master then applied the framework set out in the American Bar Association's Standards for Imposing Lawyer Discipline, which requires (1) identification of the ethical duty violated by the lawyer; (2) identification of the lawyer's mental state; and (3) examination of aggravating and mitigating circumstances. See *In the Matter of Morse*, 266 Ga. 652, 653 (470 SE2d 232) (1996) (noting that this Court looks to the American Bar Association's standards for guidance in determining the appropriate sanction to impose). The special master concluded that Eddings violated various duties he owed to the legal system, ABA Standards §§ 6.0 (addressing violations of duties owed to the legal system), 6.1 (false statements), and 6.3 (improper communication with individuals in the legal system); that he communicated improperly with the witness intentionally or knowingly for the purpose of influencing or

10

affecting the outcome of a legal proceeding; and that his improper interference significantly affected the outcome of a legal proceeding. The special master further concluded that Eddings thereafter knowingly and intentionally made false statements and submitted false documents with the intent to deceive superior court judges, the State Bar, the State Disciplinary Board, and the special master; that he also persuaded others to make false statements under oath for him; and that Eddings's false statements had a serious, or potentially serious, adverse effect on this disciplinary proceeding. For those reasons, the special master concluded that disbarment was the presumptive sanction for Eddings's violations. In weighing the aggravating and mitigating circumstances, the special master concluded that no factors in mitigation existed, but determined that almost all of the aggravating factors identified in ABA Standard 9.22 applied to this case, including: prior disciplinary history since this was Eddings's third disciplinary infraction; dishonest or selfish motive; vulnerable victim since Eddings knowingly interviewed a represented witness who was in a precarious legal position outside

11

of the presence of that witness's counsel; pattern of misconduct; multiple offenses; bad-faith obstruction of the disciplinary process; submission of false evidence during the disciplinary process; refusal to acknowledge the wrongful nature of his conduct; and substantial experience in the practice of law, having been a member of the Bar since 2002. See ABA Standards § 9.22 (a) – (i). Ultimately, the special master recommended disbarment as the appropriate discipline for Eddings's violations, particularly given application of Bar Rule 4-103.

Eddings filed exceptions and requested review by the Review Board, and the Bar responded. The Review Board then issued its report and recommendation, noting that the Bar bears the burden of proving each element of a rule violation by clear and convincing evidence, Bar Rule 4-221 (e), and that it is required to review the special master's conclusions of law de novo and accept the special master's factual findings unless they are "clearly erroneous" or "manifestly in error." See Bar Rule 4-216 (a). The Review Board concluded that the special master's factual findings were not clearly

erroneous or manifestly in error, and it adopted those factual findings as its own. The Review Board further agreed with the special master's conclusions that Eddings had violated the identified rules; that he did so knowingly and with the intent to affect the outcome of either the legal proceeding or the subsequent disciplinary proceeding; and that those proceedings were significantly affected. The Review Board essentially agreed with most of the special master's conclusions as to which aggravating and mitigating factors applied to the case. Noting that Rule 4.2 is meant to protect represented individuals from overreaching by opposing counsel, to safeguard the client-lawyer relationship from interference by adverse counsel, and to reduce the likelihood that clients will disclose privileged or other information that might harm their interests, see Comment 7 to Rule 4.2, the Review Board held that, here, Eddings violated the very essence of the Rule's protections and that he did so despite having already been warned at least twice that such behavior was an unacceptable violation of the disciplinary rules. Deferring to the special master's findings that Eddings's post-

trial efforts to disavow his sworn trial testimony were not credible, the Review Board also concluded that Eddings violated Bar Rules 3.3, 4.1, 8.l (a), and 8.4 (a) (4) by engaging in a pattern of deceit following his violation of Rule 4.2. Ultimately, after taking into consideration Eddings's prior disciplinary history and this Court's stated lack of "tolerance for a lawyer who lies during disciplinary proceedings or engages in conduct involving dishonesty, fraud, deceit, or misrepresentation," *In the Matter of Friedman*, 270 Ga. 5, 7 (505 SE2d 727) (1998), the Review Board agreed with the special master that disbarment was the appropriate discipline in this case.

Although Eddings has filed exceptions to the Review Board's Report and Recommendation, asserting that the Bar and the special master have acted dishonorably in labeling him and his witnesses as liars without any proof, he simultaneously accuses Jackson of maliciously lying throughout these disciplinary proceedings, the Bar of engaging in some ill-defined and unsubstantiated conspiracy with Jackson to see Eddings fail, and the special master of demonstrating bias and partiality in favor of the Bar—all with little or no

14

evidentiary support other than the fact that they disagree with his version of events.[1] At the core of most of Eddings's exceptions is his assertion that the special master—without providing any real explanation or rationale—erred (or overreached his discretion or exhibited bias) by finding Eddings's own sworn testimony at the witness's trial and Jackson's testimony at the hearing more credible than the physical evidence and the testimony presented at the hearing by Eddings and, what he characterizes as, his three respectable, law-abiding citizens, who had no motive to lie.

---

[1]We agree with the Bar's criticism of Eddings's claim of bias or partiality on the part of the special master, specifically that Eddings raised this claim for the first time in his exceptions; that he supported his assertion with no citation to authority; that he based his assertion on the fact that the special master ruled against him; and that he not only failed to show that the special master's rulings were erroneous, but also failed to support his claim that erroneous trial-related rulings can serve as determinative proof of bias or partiality. See *Anderson v. Anderson*, 235 Ga. 115 (218 SE2d 846) (1975) (explaining that, even where adverse rulings may be error on appeal, they do not demonstrate a judge's bias); *Gibson v. Decatur Fed. Sav. & Loan Assn.*, 235 Ga. App. 160, 166 (3) (508 SE2d 788) (1998) (to be disqualifying, the alleged bias must come from some extra-judicial source and must result in an opinion based on something other than what the judge learned from his participation in the trial);.

As an initial matter, we note that Eddings did not actually introduce any physical evidence into the record at the hearing.[2] Moreover, his efforts to attack the credibility of Jackson's testimony are unpersuasive as Jackson's alleged failure to volunteer, during his direct examination, that he spoke with Eddings on the phone on June 30, 2017, is not suspect when, as even Eddings admits, Jackson was not asked any questions during his direct examination that would call for him to reveal such information. Further, the alleged "inconsistencies" identified by Eddings in Jackson's testimony, when considered in context, do not so much reveal different stories or inconsistent responses, but instead appear to be nuanced responses to differently phrased questions or premature responses that were amended after Jackson obtained additional clarification of the question. And although Eddings faults Jackson for failing to present

---

[2] Although the Bar tendered into evidence Eddings's response to the grievance, which included as attachments certain phone records, screen shots of text messages, and affidavits, neither party laid the necessary foundation for admission of any of those exhibits as substantive evidence at the hearing. See Bar Rule 4-221.2 (the procedures and rules of evidence applicable in civil cases under the laws of Georgia apply in disciplinary proceedings occurring after a finding of probable cause).

additional evidence to corroborate his testimony that he represented the witness or that he is telling the truth about his interactions with Eddings, Eddings himself admitted that he knew Jackson represented the witness, and, regardless, Jackson bore no burden of proof in this case. Finally, to the extent that Eddings attempts to establish inconsistencies in Jackson's version of events based on quotes attributed to Jackson in a newspaper article, the record shows that Eddings never laid the necessary foundation to have the newspaper article admitted into evidence, and, in any event, Jackson's testimony was that the author of the newspaper article may have taken his statements out of context.

As for the testimony presented by Eddings's three witnesses, whose credibility Eddings contends was not even challenged, because this Court recognizes that the special master is in the best position to determine the witnesses' credibility, it generally defers to the factual findings and credibility determination made by the special master unless those findings or determinations are clearly erroneous. See *In the Matter of Cook*, 311 Ga. 206, 207 (857 SE2d

17

212) (2021); *In the Matter of Braziel*, 306 Ga. 385, 387 (830 SE2d 730) (2019) (this Court does not second-guess special master's credibility determinations if they are supported by the record); see also OCGA § 24-6-620 ("the credibility of a witness shall be a matter to be determined by the trier of fact"). In short, it is the special master who is in the best position, as the finder of fact, to determine the credibility of the witnesses, and, here, he saw fit to believe Eddings's sworn trial testimony and Jackson's sworn hearing testimony, over the sworn hearing testimony of the other witnesses, and, despite Eddings's assertions to the contrary, that decision is not clearly erroneous given the evidence admitted at the hearing.

Eddings next argues that the special master's credibility determinations do not provide a sufficient basis for concluding that clear and convincing evidence exists that he made false statements. In doing so, he seems to suggest that objective evidence, or a better quality of evidence, should be required to support the conclusion that an attorney has violated the rule against making a false statement. For example, he distinguishes his case from *In the Matter*

*of Nicholson*, 299 Ga. 737 (791 SE2d 776) (2016) and *In the Matter of Minsk*, 296 Ga. 152, 153 (765 SE2d 361) (2014), which were two of the "false statement" disciplinary cases relied upon by the special master in his report and recommendation. Namely, Eddings argues that his case relies exclusively on credibility determinations while the records in *Nicholson* and *Minsk* included physical evidence— either independent medical/billing records or a forged client signature on a court filing—which definitively proved that those attorneys were making a false statement. He also points to *Florida Bar v. Rightmyer*, 616 S2d 953 (Fla. 1993), where the Florida Supreme Court disbarred an attorney whose dishonesty was supported by his convictions for perjury, and to *In the Matter of Jefferson*, 307 Ga. 50, 52 (834 SE2d 73) (2019), where the record included evidence that witnesses had taken contemporaneous steps, in court and with the Bar, to complain about Jefferson's alleged false statements. But we are unswayed by Eddings's effort to require that false-statement disciplinary cases be established via some higher quantity or quality of proof. And we agree with the Bar that the

19

record in this case proves each rule violation, including those having to do with making false statements, by clear and convincing evidence. See OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact.").

Finally, Eddings suggests that the Bar's counsel and the special master acted improperly and in bad faith by objecting and making rulings, respectively, which precluded him from being able to introduce favorable evidence and to present additional witness testimony at the hearing, thereby prejudicing his case. But Eddings's assertions are belied by the record, which shows that Eddings made no effort to introduce any physical evidence prior to the close of evidence and that the special master properly excluded the testimony and evidence because the deposition transcripts Eddings attempted to introduce in the midst of his closing argument had not been listed in the stipulated pre-trial order; because Eddings did not even try to make the showings necessary to allow admission of the transcripts; and because the additional witnesses Eddings sought to call had not been listed in the stipulated pre-trial order.

20

Moreover, the record shows that after Eddings made a proffer of the testimony to be offered by those additional witnesses, even he agreed with the special master's alternative ruling that their testimony would be cumulative.

Ultimately, after a close review of the record in this case, we agree with the special master and the Review Board that the facts support a finding that Eddings violated Rules 3.3, 4.1, 4.2 (a), 8.1 (a), and 8.4 (a) (4) of the Georgia Rules of Professional Conduct. Further, we agree with the special master and the Review Board that disbarment is the only appropriate sanction for Eddings's violation of those rules, particularly where this is Eddings's third disciplinary infraction.[3] See Bar Rule 4-103; *Jefferson*, 307 Ga. at 55-56; *In the Matter of Koehler*, 297 Ga. 794, 796 (778 SE2d 218) (2015) (disbarring attorney, who among other things, violated Rule 8.4 (a) (4) by making materially deceitful and misleading statements

---

[3] We note that because we have concluded that Eddings violated Rule 8.1 by his submission of false evidence during the disciplinary process, we have not relied on that same conduct in aggravation of discipline under either ABA Standard 9.22 (e) or (f).

in court filings, without prior discipline); and *In the Matter of Mays*, 269 Ga. 100 (495 SE2d 30) (1998) (disbarring attorney with prior disciplinary history because, among other things, he deliberately lied to clients, to the Investigative Panel, and during the hearing before the special master). Accordingly, it is hereby ordered that the name of Michael Anthony Eddings be removed from the rolls of persons authorized to practice law in the State of Georgia. Eddings is reminded of his duties under Bar Rule 4-219 (b).

*Disbarred. All the Justices concur.*